## UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### CHARLESTON DIVISION

West Virginia Cable Telecommunications
Association, Inc., on behalf of its members,

Plaintiff,

v.

James C. Justice, Jr., in his official capacity as
Governor of West Virginia, and Patrick J.
Morrisey, in his official capacity as Attorney
General of West Virginia,

Defendants.

Case No.  2:17-cv-03609

## COMPLAINT

Plaintiff West Virginia Cable Telecommunications Association, Inc. ("WVCTA"), an association of cable operators providing video, broadband, and telephone services in West Virginia, makes this Complaint on behalf of its members for declaratory judgment and injunctive relief against Defendants James C. Justice, Jr., in his official capacity as Governor of West Virginia, and Patrick J. Morrisey, in his official capacity as Attorney General of West Virginia, stating as follows:

### Nature of the Case

1.      WVCTA respectfully requests that this Court enjoin an invalid and unconstitutional state statute recently enacted in West Virginia (Article 4 of West Virginia House Bill 3093, hereinafter "HB 3093 Art. 4") that permits third parties to move, alter, or rearrange components of WVCTA members' communications networks attached to utility poles without

their consent, authorization, or oversight, and with no prior notice in most cases, in direct contravention of federal law.

2.      Cable and telecommunications service providers such as WVCTA's members commonly attach their equipment and facilities to utility poles—some owned by private utility companies and some by municipalities—located in the public rights-of-way.  In most cases, several service providers share space on a single pole, and they typically work cooperatively with each other and the pole owner to move or rearrange their equipment, as necessary, in order to make room for any new providers wishing to attach equipment to a pole.  This process, commonly referred to as the "make-ready" process, is the subject of longstanding federal regulations that seek to ensure that all providers can share available pole space cooperatively and safely, without interfering with or damaging any provider's equipment and without interrupting any provider's services.  WVCTA's members have adhered to this comprehensive regime as they have attached their own equipment to utility-owned poles in West Virginia to support their provision of communications services.

3.      West Virginia's new statute, HB 3093 Art. 4 §§ 31G-4-1, *et seq.*, upsets the existing, carefully designed and balanced make-ready process by authorizing new users of utility poles to interfere *unilaterally* with an existing provider's equipment without that provider's authorization.  Specifically, it allows new, encroaching providers seeking to attach their own equipment to poles to move aside WVCTA members' equipment on their own, without these members' consent or oversight, with no prior notice in many instances, and using contractors not approved by WVCTA members or subject to their required standards.  Indeed, HB 3093 Art. 4 allows these encroaching attachers to do so even in cases in which the make-ready work is reasonably expected to cause service outages for WVCTA members' customers—and still

2

without these members' consent, still without approved contractors or approved standards, and with the only caveat being that the encroaching attacher must give the preexisting user 45 days' prior notice.

4.      The attachment procedures set forth in HB 3093 Art. 4 are squarely inconsistent with the comprehensive federal scheme covering private pole attachments.  Accordingly, HB 3093 Art. 4 is preempted by federal law.

5.      On this ground, WVCTA requests that this Court declare the make-ready provisions of HB 3093 Art. 4 invalid and enjoin their enforcement.  Absent such relief, WVCTA's members will suffer significant, irreparable injury to their property, operations, and customer relationships.  By departing from the carefully balanced approach to the make-ready process reflected in the detailed regulatory framework established by the Federal Communications Commission ("FCC"), HB 3093 Art. 4 exposes WVCTA members' network equipment to serious risk.  It permits third parties to encroach upon, move, and potentially damage WVCTA members' equipment, thereby imposing significant costs on WVCTA members and threatening interference with customers' services and emergency communications—while offering WVCTA members no way to prevent these harms before they occur.

### Jurisdiction and Venue

6.      This Court has federal question jurisdiction over this action, pursuant to 28 U.S.C. § 1331, because WVCTA's claims arise under the laws of the United States, including 47 U.S.C. § 224 and the FCC's implementing regulations, and the Supremacy Clause of the U.S. Constitution.  This Court has equitable jurisdiction to enjoin unconstitutional action.  *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015).

7.    Because an actual controversy within the Court's jurisdiction exists, this Court may grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

8.    Venue is proper in the Southern District of West Virginia, pursuant to 28 U.S.C. § 1391(b), because the events and omissions giving rise to WVCTA's claims occurred in Charleston, which is located within the Southern District.  HB 3093 was enacted by the West Virginia Legislature in Charleston, and was signed into law by Governor Justice in Charleston. HB 3093 Art. 4 will be enforced by Defendants and cause injury to WVCTA in its members' service areas throughout the Southern District (and elsewhere in West Virginia).

## Parties

9.    Plaintiff WVCTA is an industry association representing the interests of cable operators providing video, broadband, and telephone services in West Virginia.  Its members include Comcast of West Virginia, LLC ("Comcast"), Armstrong Utilities, Inc. ("Armstrong"), Shenandoah Telecommunications Company ("Shentel"), Suddenlink Communications ("Altice"),[1] and Time Warner Cable Midwest, LLC ("Charter").[2]  WVCTA has standing to bring the claims asserted in this Complaint on behalf of its members because (a) the subject matter of this suit is germane to WVCTA's purpose; (b) each of WVCTA's members would have standing on its own to bring these claims, given the substantial harms that WVCTA's members face if the invalid and unconstitutional state statute at issue here were to be enforced; and (c) neither the claims asserted, nor the relief requested, requires the participation of individual WVCTA members in this lawsuit.

---

[1]    In December 2015, Altice NV acquired a controlling stake in Suddenlink Communications and continues to do business under that name in West Virginia.

[2]    In May 2016, Charter Communications, Inc. acquired Time Warner Cable, Inc. and its subsidiaries, and has retained the legal name of this acquired subsidiary in West Virginia.

10.     Defendant James C. Justice, Jr. is the Governor of West Virginia.  Pursuant to Article VII, Section 5 of the West Virginia Constitution, the Governor is vested with the chief executive power of the State and is responsible for ensuring that the laws of the State are "faithfully executed."  Defendant Justice is sued in his official capacity only.

11.     Defendant Patrick J. Morrisey is the Attorney General of West Virginia.  Pursuant to Article VII, Section 1 of the West Virginia Constitution and Chapter 5, Article 3 of the West Virginia Code, the Attorney General is the chief legal officer of the State and is responsible for prosecuting and defending all suits in which the State has an interest.  Defendant Morrisey is sued in his official capacity only.

### Statement of Facts

#### *WVCTA Members' Networks*

12.     WVCTA's members are providers of communications services—including cable television, broadband Internet access, and telephone services—in West Virginia.  The WVCTA members identified above collectively serve approximately 400,000 subscribers in the state.  WVCTA also has dozens of other member cable operators that, collectively with the WVCTA members identified above, provide service in virtually every community in West Virginia.

13.     WVCTA's members provide communications services to their customers through extensive networks of fiber optic and coaxial cable and other communications equipment and facilities.  Many components of these networks are attached to utility poles located in the public rights-of-way.

14.     WVCTA's members have attached components of their networks to hundreds of thousands of utility poles across West Virginia.  Many of these utility poles are owned by privately owned utilities in the state, including Frontier Communications, First Energy

5

Corporation, and American Electric Power. As explained further below, federal law grants the

FCC expansive authority to regulate attachments on such private utility-owned poles. The FCC,

in turn, has used that authority to establish a detailed regulatory regime for such attachments.

Among other things, these federal rules set forth an orderly process through which a pole's

owner and service providers with existing attachments on the pole can coordinate with service

providers that wish to install new equipment on that pole. This FCC-mandated process includes

detailed "make-ready" procedures whereby service providers with existing attachments are given

60 days (and 105 days for larger orders)[3] to rearrange their equipment to accommodate new

service providers. *See* 47 C.F.R. § 1.1420(e). The FCC's rules strike a careful "balance between

encouraging deployment of facilities and safeguarding the network" of existing providers—by

providing workable and fair procedures enabling new service providers to add their equipment to

poles while minimizing disruption to and protecting the security of existing providers' networks.

*Implementation of Section 224 of the Act*, Report and Order and Order on Reconsideration, 26

FCC Rcd 5240 ¶ 61 (2011) ("*2011 Pole Attachment Order*").

      15.    WVCTA's members generally do not own any of the utility poles in West

Virginia to which components of their networks are attached (with the exception of Armstrong,

which owns just 121 poles in the state).

---

[3]    The FCC's 60-day period in which providers with existing attachments have the ability to perform make-ready work on their own equipment applies to orders "up to the lesser of 300 poles or 0.5 percent of the utility's poles in a state." 47 C.F.R. § 1.1420(g)(1). FCC regulations extend the make-ready period to 105 days for "larger orders up to the lesser of 3,000 poles or 5 percent of the utility's poles in a state." *Id.* § 1.1420(g)(3). For orders exceeding those higher thresholds, the FCC's rules provide that the timing for make-ready work shall be subject to "good faith" negotiation rather than a prescribed timeframe. *Id.* § 1.1420(g)(4).

*The West Virginia Statute*

16.     On April 8, 2017, the West Virginia Legislature passed HB 3093.  Defendant

Justice, in his official capacity as Governor, signed HB 3093 into law on April 26, 2017.  HB

3093 takes effect on July 7, 2017.  A copy of HB 3093 is attached hereto as Exhibit A.

17.     HB 3093 amends the Code of West Virginia by adding a new Chapter 31G,

entitled "Broadband Enhancement and Expansion Policies."  Article 4 of Chapter 31G is entitled

"Make-Ready Pole Access," and regulates the terms and procedures through which parties may

attach their communications lines and equipment to other parties' utility poles located in the

public rights-of-way.  HB 3093 Art. 4 purports to authorize new "Attachers"—that is,

encroaching third parties that wish to add their lines or equipment to an existing pole—to alter or

relocate preexisting attachments owned by other users of utility poles, including WVCTA's

members, with no prior notice to those existing users, without the existing users' consent or

authorization, without advance payment for associated costs, and using contractors not approved

by WVCTA members or subject to their required standards.

18.     Specifically, HB 3093 Art. 4 provides that, "[u]pon approval of an Attachment

Application [by the pole owner], an Attacher may relocate or alter the attachments or facilities of

any Pre-Existing Third Party User as may be necessary to accommodate an Attacher's

attachment[.]"  § 31G-4-2(a).  The statute does not require a new attacher to provide *any* prior

notice to a preexisting user before relocating or altering the preexisting user's equipment.

Instead, a preexisting user would find out about any relocation or alteration of its equipment only

*after* it had occurred, as an encroaching attacher need only provide notice "[w]ithin thirty days of

the completion of any relocation or alteration."  § 31G-4-2(c).  Moreover, the statute

contemplates the use of "Pole Owner[-]approved contractors" to perform this work—not

contractors approved by preexisting users (such as many of WVCTA's members) that do *not* own poles.

19.     Moreover, in cases where the encroaching attacher's actions "would reasonably be expected to cause a customer outage," the only nod HB 3093 Art. 4 makes is to require that the encroaching attacher provide 45 days' notice before it can rearrange an existing attacher's equipment. § 31G-4-2(a).  HB 3093 Art. 4 appears to grant the encroaching attacher—rather than the relevant preexisting user—sole discretion to determine whether any make-ready work is reasonably expected to cause a customer outage in a manner that would trigger the 45-day notice period.  While this provision of HB 3093 Art. 4 nominally contemplates that preexisting users could perform the necessary work during the 45-day notice period, that window would provide substantially less time than federal regulations contemplate (especially in light of the 105-day period that applies to larger orders).

20.     As noted above, upon completion of the make-ready work, HB 3093 Art. 4 requires that the encroaching attacher notify the affected preexisting user within 30 days and provide a report with basic information about the work conducted.  Although HB 3093 Art. 4 purports to grant the affected preexisting user a right to inspect the third-party's work, it requires the encroaching attacher to pay for repairs or corrections related to the work *only if* the work fails to conform to standards or requirements established by the *pole owner*.

21.     Thus, as applied to WVCTA's members, HB 3093 Art. 4 permits encroaching attachers to move, rearrange, and alter components of a member's network without the member's consent or authorization, and with no notice at all in many cases (or, when an outage is unilaterally determined by the encroaching attacher to be likely, less notice than the FCC's rules require).  Moreover, HB 3093 Art. 4 provides that such work may be performed by third-party

contractors not approved by the WVCTA member whose equipment is being altered or relocated, and without any oversight by the member.  And HB 3093 Art. 4 offers WVCTA's members (many of which own no utility poles) little recourse in the event that make-ready work performed by a third party damages or interferes with their equipment or inconveniences or damages their customers.

### Federal Law Governing Pole Attachments

22.     West Virginia enacted HB 3093 Art. 4 despite the fact that federal law already establishes detailed procedures governing the pole "make-ready" process.  Federal law grants the FCC broad authority to "regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable." 47 U.S.C. § 224(b)(1).  Pursuant to that authority, the FCC has promulgated a thorough set of regulations that directly govern the procedures for attaching new equipment to privately owned utility poles.

23.     The FCC's rules set forth a four-stage process.  The first stage is a "survey phase," during which "the pole owner conducts an engineering study to determine whether and where attachment is feasible, and what make-ready is required." *2011 Pole Attachment Order* at 5252, ¶ 22; *see also* 47 C.F.R. § 1.1420(c).  The second stage is an "estimate" phase, in which the pole owner must "provide[] an estimate of the make-ready charges" after "receiving the results of the engineering survey." *2011 Pole Attachment Order*, 26 FCC Rcd. at 5252, ¶ 22; *see also* 47 C.F.R. § 1.1420(d).  Third is the "acceptance" stage, in which the entity seeking to attach new equipment must "approve the estimate" of the cost of make-ready work "and provide payment." *2011 Pole Attachment Order*, 26 FCC Rcd. at 5252, ¶ 22; *see also* 47 C.F.R. § 1.1420(d)(2).  The fourth and final stage is the "make-ready" phase, in which the pole owner must send notice to preexisting users of the "need[]" to perform make-ready work to

accommodate the new attacher, and each preexisting user has "60 days" (and in some

circumstances, up to 105 days) to perform the necessary make-ready work on its own equipment.

*2011 Pole Attachment Order*, 26 FCC Rcd. at 5252, ¶ 22; *see also* 47 C.F.R. §§ 1.1420(e),

(g)(3).  As long as any required work is performed within those time periods, the regulations

would give the new attacher no right whatsoever to disturb the preexisting user's equipment.  47

C.F.R. § 1.1420(e).

      24.     The FCC adopted this baseline 60-day period based on the voluminous evidence it

compiled indicating that such a period is a "workable timeframe that many utilities can meet"

and thus "furthers [the FCC's] interest in dependability." *2011 Pole Attachment Order* ¶ 32.

The FCC pointed in particular to "[t]he successful experiences of several utilities *and* attachers"

as support for "the pragmatism of selecting this [60-day] model," and cited submissions showing

that utilities and attachers sometimes "need 60 days to perform make-ready," especially in

situations where "multiple parties must be sequenced to perform make-ready." *Id.*  The agency

also expressly rejected proposals to adopt a shorter 45-day period, finding that such a timeframe

often is inadequate for fulfilling larger make-ready requests or requests involving "complicating

factors." *Id.*  And the FCC cited its desire to "synchronize make-ready with the Commission's

existing rules that give entities with existing attachments 60 days to move them before a pole

owner modifies a pole." *Id.* ¶ 31.

      25.     By directly empowering new, encroaching attachers to alter and move other pole

users' property with no prior notice in many cases (and only 45 days' notice if the encroaching

attacher concludes that an outage is likely), HB 3093 Art. 4 squarely conflicts with the binding

federal regulations and the FCC's express policy choices.  Moreover, by depriving preexisting

attachers of significant control over their attachments, HB 3093 Art. 4 upsets the careful

"balance between encouraging deployment of facilities and safeguarding the network" that the FCC's regulations are designed to maintain. *Id.* ¶ 61.

26.     While 47 U.S.C. § 224(c) authorizes states to "regulate[] the rates, terms, and conditions for pole attachments" in lieu of the federal rules governing utility-owned poles, and establishes a process for a state to certify to the FCC that it has asserted authority over attachments on such poles, West Virginia has not made such a certification to the FCC.  A State is deemed to "regulate[] the rates, terms, and conditions for pole attachments" only when it has "issued and made effective rules and regulations implementing the State's regulatory authority over pole attachments" and established a compliant procedure for handling complaints.  47 U.S.C. § 224(c).

### *Injury to WVCTA's Members*

27.     HB 3093 Art. 4 upsets WVCTA members' settled expectations and conflicts with federal law.  Although federal law already prescribes detailed procedures for the performance of make-ready work, HB 3093 Art. 4 purports to establish significantly different procedures that afford substantially less protection to WVCTA's members and their customers.

28.     Enforcement of HB 3093 Art. 4 will also inflict significant economic harm and other injuries on WVCTA's members and their customers.  WVCTA's members depend on their networks—including network components attached to utility poles in West Virginia—to provide contracted-for services to their customers.  To ensure the quality of the services they provide, WVCTA's members have invested millions of dollars in the installation, testing, maintenance, and repair of their network components attached to utility poles in West Virginia.

29.     Any interruption or outages in the services that WVCTA's members provide to their customers—including interruptions or outages caused by interference with components of

11

their networks attached to utility poles—threatens the loss of significant revenue.  Enforcement of HB 3093 Art. 4 will increase the risk of interruptions and outages in members' services because HB 3093 Art. 4 authorizes third-party contractors to perform make-ready work on members' networks without members' authorization or oversight.  Due to their lack of familiarity with WVCTA members' equipment and standards, such third-party contractors are significantly more likely to damage members' equipment or interfere with their services.  But for HB 3093 Art. 4, WVCTA's members could perform all or substantially all of any necessary make-ready work *themselves* (or using their own contractors), thereby taking steps to prevent any damage to their equipment and to limit any interruptions and outages for their services.

30.     In many cases, WVCTA's members will have no opportunity to avoid such losses, as HB 3093 Art. 4 permits third parties to alter and relocate a member's equipment with no prior notice whatsoever, and using contractors and standards not approved by the member.  In those instances where an encroaching attacher determines that the make-ready work is likely to cause an outage and provides 45 days' notice under HB 3093 Art. 4, WVCTA's members will be forced to commit significant resources in an effort to perform as much of the requested make-ready work as possible during that limited notice period, which is shorter than the permissible period for such work established by the FCC and which, the FCC recognized, may be too short to successfully complete make-ready on larger or more complicated orders.  Marshaling the necessary resources on an expedited basis to make repairs when third parties move forward with make-ready work and damage existing attachments—including personnel, equipment/supplies, and engineering expertise—will be extremely costly.  Given the large number of utility poles within West Virginia to which WVCTA's members have attached components of their networks, such costs will easily amount to millions of dollars.  Absent HB 3093 Art. 4, much of those costs

would be avoided, as the federal regulations  explicitly permit a preexisting user to perform any necessary make-ready work itself on a reasonable timetable.

31.     HB 3093's provisions allowing third parties to access WVCTA members' network equipment without authorization also are at odds with federal cybersecurity guidelines concerning the need to prevent unauthorized third-party access to and tampering with network equipment.  *See, e.g.*, White House, Executive Order No. 13636, "Improving Critical Infrastructure Cybersecurity," § 4(c) (Feb. 12, 2013), *available at* https://www.whitehouse.gov/the-press-office/2013/02/12/executive-order-improving-critical-infrastructure-cybersecurity (articulating the federal government's interest in ensuring that "owners and operators of critical infrastructure . . . protect[] their systems from unauthorized access, exploitation, or harm"); White House, Executive Order No. 13800, "Strengthening the Cybersecurity of Federal Networks and Critical Infrastructure," §§ 1(b)(i), 2(a) (May 11, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/05/11/presidential-executive-order-strengthening-cybersecurity-federal (reiterating the federal "policy" of supporting the efforts of "the owners and operators of the Nation's critical infrastructure" to safeguard their networks from "unauthorized access"); National Institute of Standards and Technology, "Framework for Improving Critical Infrastructure Cybersecurity," at 23 (Feb. 12, 2014), *available at* https://www.nist.gov/sites/default/files/documents/cyberframework/cybersecurity-framework-021214.pdf (indicating that "[a]ccess to assets and associated facilities [must be] limited to authorized users"); Communications Security, Reliability, and Interoperability Council, "Cybersecurity Risk Management and Best Practices Working Group 4: Final Report" (Mar. 2015), at 78, *available at* https://transition.fcc.gov/pshs/advisory/csric4/

CSRIC_IV_WG4_Final_Report_031815.pdf (stating that "[p]hysical access to [network] assets"
must be "managed and protected" by the network operator).

32.     Many of the encroaching attachers—to which HB 3093 Art. 4 grants nearly
unfettered access to the networks of WVCTA's members—will be competitors of WVCTA's
members. Thus, the entity supervising the make-ready work will have very little incentive to
avoid damaging members' equipment. It is for precisely this reason that the carefully balanced
federal pole attachment regulations provide preexisting users a reasonable opportunity to
perform any necessary make-ready work *themselves.* Indeed, such damage is likely to result
from work performed even by *well-intentioned* new attachers, given that third-party contractors
will not have any familiarity or expertise with WVCTA members' network or quality standards.

33.     Repairing any damage to members' equipment will be costly and disruptive to
other work, requiring a significant commitment of resources that could be avoided if members
were afforded reasonable oversight of work performed on their networks. Making repairs to
attachments on even a single utility pole can cost tens of thousands of dollars. If enforcement of
HB 3093 Art. 4 were enjoined, such repairs would not be necessary, thereby eliminating those
costs.

34.     Damage caused to WVCTA members' equipment by encroaching attachers also
likely will lead to a significant number of service outages for members' customers, and frequent
service outages will cause significant damage to customer goodwill and to members' reputations.
Repeated service outages may even lead members' customers to cancel their services,
threatening additional harm to members' businesses and revenues. These risks are only
heightened by the fact that damage to attachments *on even a single utility pole* can potentially
cause service outages for *thousands* of customers.

35.     Service outages also may cause interruptions to emergency communications in West Virginia—for example, 911 calls—which frequently travel over the networks of WVCTA's members.  In addition, signal leakage caused by damage to members' equipment could interfere with aviation communications.  Such interruptions and interference may endanger the public and expose WVCTA's members to millions of dollars in potential liability, as well as FCC penalties. Again, by significantly expanding the authorization of third-party contractors not approved by a preexisting user to perform make-ready work on its network, HB 3093 Art. 4 substantially increases the likelihood that such problems will occur.

36.     HB 3093 offers WVCTA's members little recourse against these potential injuries.  Although HB 3093 does provide a preexisting user with a limited right to inspect make-ready work performed on its network by a third party weeks *after* the work is completed, HB 3093 does not entitle WVCTA's members to reimbursement for any necessary corrections to such work, or any other meaningful remedy, unless the work fails to comply with standards or requirements imposed *by the pole owner*.

37.     Because many of WVCTA's members do not own any utility poles in West Virginia, HB 3093 does nothing to ensure that third-party make-ready work on components of members' networks will comply with members' *own* robust safety and engineering standards. WVCTA's members thus will bear the often-substantial costs of bringing such work into compliance with their standards after the fact.  Such failures to adhere to WVCTA members' standards are likely to occur frequently, as contractors retained by third parties to perform make-ready work on members' networks will not be familiar with members' standards and requirements.

38.     In sum, enforcement of HB 3093 Art. 4 with respect to WVCTA members' networks in West Virginia will cause immediate and irreparable injury to members, including by causing interference with their property and disruptions to their services, as well as imposing significant non-reimbursable costs.

### Claim for Relief

### HB 3093 Art. 4 is Preempted by Federal Law

39.     The allegations of paragraphs 1 through 38 above are incorporated as though fully set forth herein.

40.     As applied to privately owned poles (such as the poles owned by Frontier, First Energy Corporation, and American Electric Power to which WVCTA's members attach their network equipment), HB 3093 Art. 4 squarely conflicts with federal law.  As noted above, the FCC's pole attachment rules establish a detailed four-stage process for attaching new equipment to privately owned utility poles, and provide that once an entity with existing attachments on a privately owned utility pole has received notice that another communications provider wishes to attach equipment to that pole, the existing user has up to 60 days (and in some cases up to 105 days) to relocate its attachments to accommodate the new attacher.  47 C.F.R. § 1.1420(e).

41.     The procedures and requirements set out by HB 3093 Art. 4 plainly conflict with those procedures.  HB 3093 Art. 4 gives existing users *no* opportunity in most instances to perform make-ready work on their own equipment, and instead authorizes the encroaching attacher to perform make-ready work and to relocate any existing user's equipment without any notice (as opposed to the federally mandated 60-105 day notice period).  Moreover, while HB 3093 Art. 4 nominally gives an existing user a 45-day period to perform its own make-ready work when the encroaching attacher concludes that such work likely *would* cause an outage, that

16

window also is significantly shorter than the notice period of 60-105 days set forth in the FCC's rules.

42.     By directly conflicting with FCC regulations and by upsetting the careful balance struck by the FCC between encouraging development of facilities and safeguarding communications, HB 3093 Art. 4 interferes with binding federal policy choices—which reflect an extensive process of deliberation, including the consideration of numerous competing interests and collaboration with a wide range of stakeholders and constituencies.

43.     Under the Supremacy Clause of the Constitution (U.S. Const. art. VI, cl. 2), state laws that conflict with validly enacted federal laws are *ultra vires* and void.  For that reason, HB 3093 Art. 4 is invalid.

44.     Unless the Court declares that the make-ready provisions of HB 3093 are invalid and permanently enjoins Defendants from enforcing them, WVCTA's members will suffer irreparable injury that cannot be redressed by recovery of damages.  Among other injuries, WVCTA's members will be forced to comply with and acquiesce to an unconstitutional state statute, will suffer reputational injury and a loss of customer goodwill, and will be subjected to extensive potential liability and litigation risk resulting from the effects of HB 3093's enforcement.  WVCTA's members will also be subjected to improper interference with their business, operations, and property.  A permanent injunction will advance the public interest by giving effect to policy choices validly enacted by Congress and implemented by the FCC, and by preventing Defendants from illegally interfering with those choices.

45.     WVCTA's members are entitled to a judgment declaring the make-ready provisions of HB 3093 invalid and unenforceable.  WVCTA's members also are entitled to a

permanent injunction restraining the Defendants from enforcing the make-ready provisions of HB 3093.

### **Prayer for Relief**

WHEREFORE, WVCTA respectfully requests that this Court grant the following relief:

   a.   A declaration and judgment that the make-ready provisions of HB 3093 are invalid because they conflict with and are preempted by federal law.

   b.   An order permanently enjoining the Defendants from enforcing HB 3093's make-ready provisions.

   c.   An award of reasonable costs and attorneys' fees.

   d.   Such further relief as the Court deems just and equitable.

Dated:  7/14/2017                    Respectfully submitted,

                                     */s/ Richard L. Gottlieb*
                                     Richard L. Gottlieb (WV Bar #1447)
                                     Spencer D. Elliott (WV Bar #8064)
                                     LEWIS, GLASSER, CASEY & ROLLINS, PLLC
                                     BB&T Square Suite 700
                                     300 Summers Street
                                     Charleston West Virginia 25301
                                     (304) 345-2000
                                     E-mail: rgottlieb@lgcr.com
                                     E-mail: selliott@lgcr.com

                                     Matthew A. Brill (*PHV* motion to be filed)
                                     Melissa Arbus Sherry (*PHV* motion to be filed)
                                     Matthew T. Murchison (*PHV* motion to be filed)
                                     Lilit Sheymajash Edwards (*PHV* motion to be filed)
                                     LATHAM & WATKINS LLP
                                     555 Eleventh Street NW, Suite 1000
                                     Washington, DC 20004
                                     (202) 637-2200
                                     E-mail: matthew.brill@lw.com
                                     E-mail: melissa.sherry@lw.com
                                     E-mail: matthew.murchison@lw.com
                                     Email: lilit.edwards@lw.com

                                     *Attorneys for Plaintiff West Virginia Cable*
                                     *Telecommunications Association, Inc.*

18