UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

**WEST VIRGINIA CABLE**
**TELECOMMUNICATIONS**
**ASSOCIATION, INC.,**
on behalf of its members,

      *Plaintiff*,

  v.                             Civil Action No. 2:17-cv-03609
                                  (Honorable John T. Copenhaver, Jr.)

**JAMES C. JUSTICE, JR., in his**
**official capacity as Governor of**
**West Virginia, and PATRICK J.**
**MORRISEY, in his official**
**capacity as Attorney General of**
**West Virginia**

      *Defendants.*

---

**MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION TO DISMISS**

---

## CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 1

ARGUMENT ........................................................................................................................ 5

I.     Sovereign Immunity Bars WVCTA's Lawsuit. ................................................... 5

II.    WVCTA Lacks Article III Standing. .................................................................. 7

       A.    WVCTA's Members Suffered No Injury In Fact, Nor Are Its Members In "Certainly Impending" Danger Of Suffering An Injury. ........................................... 8

       B.    Assuming That The WVCTA's Members Suffered An Injury—And They Have Not—The Governor And Attorney General Did Not Cause It, Nor Could They Remedy It. ...................................................................................... 10

CONCLUSION ................................................................................................................... 12

## INTRODUCTION

During the most recent legislative session, the State of West Virginia implemented a program to comprehensively overhaul of the State's broadband-internet infrastructure. Despite the uncontroversial, bipartisan goal of spreading internet access to underserved areas of West Virginia, many, including the West Virginia Cable Telecommunications Association, Inc. ("WVCTA"), lobbied against the bill. Having lost in the political fray, WVCTA now asks this Court to block the provision that would allow greater and more efficient access to utility poles across the State.

WVCTA's complaint must be dismissed, for want of jurisdiction. *First*, sovereign immunity dictates that neither Governor Justice nor Attorney General Morrisey can be sued in federal court without the State's consent, save for limited circumstances that do not apply to this case. *Second*, WVCTA failed to establish that it has the requisite Article III standing to maintain this suit. For either of these reasons, the Governor and Attorney General respectfully request that the Court dismiss WVCTA's complaint.

## BACKGROUND

On July 7, 2017, West Virginia House Bill 3093 went into effect. Designed to enhance and expand broadband internet access across the State, House Bill 3093 represents West Virginia's attempt to bring high-speed internet access to historically underserved communities. It is comprised mainly of commonsense and uncontroversial measures. For instance, House Bill 3093 provides insurance money for loans to fund broadband-internet development projects and expressly allows broadband companies to employ advanced techniques for fiber-optic network installation. *See* W. Va. Code § 12–6c–11(h); W. Va. Code § 31–15–8(b)(6); W. Va. Code §§ 31G–3–1, *et seq*.; W. Va. Code § 31G–1–4(7).

The sole provision at issue is Article 4. Article 4 addresses attachments on West Virginia's vast utility-pole network. Historically, the State helped utility companies acquire space to install the infrastructure they needed, which includes utility poles, through eminent-domain condemnation followed by a public right-of-way grant. The utilities recovered the acquisition and construction costs by charging users rates for services.

With the advent of cable television, cable companies began to avail themselves of this infrastructure by leasing space on utility poles for purposes of "attach[ing]" their equipment. *See Nat'l Cable & Telecoms. Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327, 330 (2002) (cable companies "have found it convenient, and often essential, to lease space for their cables on telephone and electric utility poles"). When the cable companies "grew upset with the access rates," they "complained to Congress that the utilities 'were exploiting their monopoly position by engaging in widespread overcharging.'" *Gulf Power Co. v. U.S.*, 187 F.3d 1324, 1326 (11th Cir. 1999) (quoting *FCC v. Fla. Power Corp.*, 480 U.S. 245, 247 (1987)). In response, Congress enacted the Pole Attachments Act in 1978, which "allowed cable companies to force their way onto utility poles at regulated rates." *Ala. Power Co. v. FCC*, 311 F.3d 1357, 1362 (11th Cir. 2002). In 1996 Congress amended the Pole Attachment's act to extend the same benefits to telecommunication service providers. *Nat'l Cable*, 534 U.S. at 330.

As amended, the Pole Attachments Act (and the FCC's implementing regulations) cover only those utility poles "used for . . . wire communications" and attachments made "by a cable television system or provider of telecommunications service." 47 U.S.C. § 224(a)(1), (4). This is due, in part, to Congress's recognition that the States can more effectively regulate utility-pole access and resolve disputes than the federal government. Indeed, Congress understood such issues to be "essentially local in nature" and determined that "no federal formula could accommodate all

2

the various local needs and priorities in an entirely satisfactory manner." Communications Act Amendments of 1977, S. Rep. No. 95-580, at 18 (recognizing that "familiarity with the specific operating environment . . . within a state as well as the needs and interests of state or local constituents, is indispensable to efficient and equitable regulation"). So, Congress provided a mechanism through which a State can displace the federal regime with its own. *See* 47 U.S.C. §224(c); S. Rep. No. 95-580 at 14 (Congress desired to "prompt[] the several states . . . to develop their own plans free of federal prescriptions").

In 2011, the FCC promulgated the regulations that currently govern, at the federal level, utility-pole attachments. *See* 76 Fed. Reg. 26620 (May 9, 2011). Before that rulemaking, the Commission recognized that "access to poles, including the preparation of poles for attachment, commonly termed 'make-ready,' must be timely in order to constitute just and reasonable access." 75 Fed. Reg. 45494, 45496 (Aug. 3, 2010). It further opined that "[m]ake-ready or other pole access delays not warranted by the circumstances thus are unjust and unreasonable under section 224." *Id*. For this reason, the 2011 FCC regulations established "maximum timeframes" for the various steps in the utility-pole attachment process. 76 Fed. Reg. 26620, 26621 (May 9, 2011). In ordinary cases, the FCC decided cable companies and providers of telecommunications services cannot reasonably have more than sixty days to perform make-ready work on their utility pole attachments themselves. 76 Fed. Reg. at 26622.

In the 2017 legislative session, West Virginia examined the ways in which it could improve broadband service to areas where, historically, connectivity was lacking. To assist with the spread of necessary infrastructure, the legislature made it lawful, via Article 4, for "any person, corporation, or other entity" that has approval from a utility-pole owner to "relocate or alter" any existing attachments. So long as the planned relocation or alteration would not "reasonably be

3

expected to cause a customer outage," advanced notice need not be given to the existing pole-attachment owners. *See* W. Va. Code § 31G–4–2(a). If a relocation or alteration appears likely to disrupt existing services, the existing pole-attachment owners are entitled to forty-five days' notice before the move may proceed. *Id*. The person or entity desiring to move existing pole attachments bears all costs and assumes all risks of damage or outages caused to the property or business of the existing attachment owners. W. Va. Code §31G–4–2(d)–(g).

WVCTA filed the instant action one week after Article 4 went into effect. Naming Governor Justice and Attorney General Morrisey as Defendants (each in their official capacities), the suit asks the Court to declare void Article 4 and to permanently enjoin the Governor and Attorney General from "enforcing" it. Compl. at 18. The WVCTA argues that federal law preempts Article 4, which, in its view, conflicts with governing FCC regulations.

The FCC, however, is in the process of comprehensively reviewing its make-ready regulations. *See* 82 Fed. Reg. 22453 (May 16, 2017). In its Notice of Proposed Rulemaking, the FCC has specifically solicited comments on whether to eliminate the notice provisions in its 2011 regulations, which has the potential to harmonize the federal scheme with Article 4. *See* 82 Fed. Reg. at 22454 ("We seek comment on proposals to streamline and accelerate the Commission-established timeline for processing pole attachment requests, which currently envisions up to a five-month process . . . ."); 82 Fed. Reg. at 22455–56 ("We seek comment on whether the Commission should adopt rules that would allow new attachers to use utility-approved contractors to perform 'routine' make-ready work and also to perform 'complex' make-ready work (i.e., make-ready work that reasonably would be expected to cause a customer outage) in situations where an existing attacher fails to do so."); 82 Fed. Reg. at 22456 ("We seek comment on whether we should

adopt rules to allow new attachers (using utility-approved contractors) to perform routine make-ready work in lieu of the existing attacher performing such work.").

## ARGUMENT

This Court has no jurisdiction to entertain WVCTA's suit. As an initial matter, the State of West Virginia has not waived its sovereign immunity, and the narrow *Ex parte Young* exception does not cure this defect. Moreover, WVCTA lacks Article III standing, because (1) the purported injuries to its members are wholly speculative and plainly not imminent; and (2) even assuming its members suffered (or will imminently suffer) an injury-in-fact, neither of the Defendants caused it. For either of these reasons, the Court should dismiss WVCTA's complaint.

**I.     Sovereign Immunity Bars WVCTA's Lawsuit.**

West Virginia's Constitution is clear: the State "shall never be made defendant in any court of law or equity." W. Va. Const. art VI, § 35. Typically, this means that "federal courts may not entertain a private person's suit against" the State of West Virginia, unless one of two conditions occurs: (1) West Virginia waives its sovereign immunity, or (2) the federal government abrogates it. *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011); see *also Hans v. Louisiana*, 134 U.S. 1 (1890) (holding that even though the Eleventh Amendment expressly applies to "citizens of another State" its enactment confirms the States retained their sovereign immunity when they entered the Union). Neither of those conditions are satisfied here.

Because neither of those conditions are satisfied, WVCTA has sued two West Virginia constitutional officers, in their respective official capacities, to (we assume) avail itself of the limited and narrow *Ex parte Young* exception to the state-sovereign immunity. WVCTA cannot do so. *Ex parte Young* creates an exception to a state sovereign-immunity bar only when a state official is sued for the "consequences of his individual *conduct*." *Ex parte Young*, 209 U.S. 123, 159–60 (1908) (emphasis added); *see also Pennhurst State School and Hosp. v. Halderman*, 465

U.S. 89, 102 (1984) ("a suit challenging the constitutionality of a state official's *action* is not one against the State" (emphasis added)); *Green v. Mansour*, 474 U.S. 64, 71 (1985) ("a suit challenging the constitutionality of a state official's *action* in enforcing state law is not one against the state" (emphasis added)). The operative terms, for purposes of this case, are "conduct" and "action." For that reason, *Ex parte Young* only applies to a state official "who *acts* unconstitutionally." *Pennhurst State School and Hosp.*, 465 U.S. at 104 (1984) (emphasis added). It is "limited to that precise situation" because, otherwise, "the state" becomes the "real, substantial party in interest." *Va. Office for Prot. & Advocacy*, 563 U.S. at 255; *Ford Motor Co. v. Dep't of Treasury of Ind.*, 323 U.S. 459 (1945). And forcing a state to assume, without consent, the role of the party in interest is precisely the situation that state-sovereign immunity bars.

Accordingly, when no "action" is taken in violation of federal law, *Ex parte Young* does not apply. This fact dooms WVCTA's complaint. Indeed, WVCTA's complaint is wholly devoid of any allegation regarding unconstitutional conduct, action, or proceeding taken by the Governor or the Attorney General. To the best of Defendants' knowledge, no Court has ever allowed a litigant to use *Ex parte Young* in this fashion, as it would plainly allow a litigant to direct a suit squarely and exclusively at the State *qua* State, rather than at state officials affirmatively engaged in unconstitutional conduct.

Perhaps anticipating this objection, WVCTA asserts that it wants to prevent the Defendants from "enforcing" Article 4. Compl. at 18. This cannot be a basis for an end run around the State's sovereign immunity. As a threshold matter (and as discussed at greater length below), neither the Governor nor the Attorney General have any role in enforcing Article 4's pole-attachment regime. Moreover, courts "narrowly construe[]" *Ex parte Young*, never giving it "an expansive interpretation," lest the exception turn into a mechanism "that threaten[s] to evade sovereign

6

immunity." *Pennhurst State School and Hosp.*, 465 U.S. at 105, 114 n.25 (1984); *see also Va. Office for Prot. & Advocacy*, 563 U.S. at 256. As noted above, WVCTA fails to refer to any specific unlawful action that the Governor or Attorney General have taken or are likely to take in the future. Allowing WVCTA's suit to survive in spite of this vacancy "would be to adhere to an empty formalism and to undermine the principle . . . that Eleventh Amendment immunity represents a real limitation on a federal court's federal-question jurisdiction." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 270 (1997). Indeed, it would effectuate a "serious affront to state sovereignty," *Va. Office for Prot. & Advocacy*, 563 U.S. at 266 (Kennedy, J., concurring), and would upset "the balance of federal and state interests that" our constitutional system embodies. *Papasan v. Allain*, 478 U.S. 265, 277 (1986).

West Virginia must be allowed to pass laws that are not immediately subject to federal-court line-item vetoes before the State's own officials, agencies, and courts have a chance to administer, interpret, or enforce them. Without the State's consent (or valid federal abrogation), sovereign immunity protects the State's legislative process from this species of federal-court interference. WVCTA should not be permitted to use *Ex parte Young* to circumvent this critical safeguard. For that reason, the Court should dismiss WVCTA's complaint.

## II. WVCTA Lacks Article III Standing.

There is perhaps nothing more fundamental to federal-court practice than the principle that, "[w]ithout jurisdiction the court cannot proceed at all in any cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1868)). Because "[j]urisdiction is power to declare the law . . . when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Id*. (quoting *Ex parte McCardle*, 7 Wall. at 514). "The requirement that jurisdiction be established as a threshold

matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" *Id.* (quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884)).

Similarly, there is perhaps nothing more familiar than the notion that "[t]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). *First*, WVCTA's members must have suffered an "injury in fact." *Id*. *Second*, the injury must be "fairly traceable to the challenged action[s] of the [Defendants], and not the result of the independent action of some third party not before the court." *Id*. (alterations omitted). And *third*, "it must be likely, as opposed to merely speculative, that [its] injury will be redressed by a favorable decision." *Id*. at 561 (quotation marks omitted).

WVCTA has satisfied none of the three Article III standing elements. Its members have not suffered, nor are in imminent danger of suffering, an injury-in-fact. Even if it could show that its members suffered a concrete injury—and it cannot so demonstrate—neither the Governor nor the Attorney General caused it and a court order directed at these Defendants would not remedy it. Accordingly, the Court must dismiss the complaint.

### A. WVCTA's Members Suffered No Injury In Fact, Nor Are Its Members In "Certainly Impending" Danger Of Suffering An Injury.

The Court must dismiss the Association's case *in toto* because Article 4's pole-attachment provisions have done no harm to WVCTA's members. Notwithstanding WVCTA's hand-wringing, its complaint lacks any suggestion that any person has so much as laid a finger on one of its members' pole attachments or that it is "certainly impending" that any person will do so. Because demonstrating a concrete and particularized injury-in-fact is necessary to trigger federal-court jurisdiction, WVCTA's failure to do so warrants dismissal.

A litigant only has standing to bring a claim and seek relief in a federal court if they "'clearly . . . allege facts demonstrating'" that they have "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Where, as here, a litigant fails to allege that the requisite "injury-in-fact" has already occurred and instead relies on a purported threat of future injury, the Constitution requires that the threatened injury must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (citing *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). The Supreme Court has unambiguously held that "[a]llegations of '*possible* future injury' are not sufficient." *Clapper*, 568 U.S. at 409 (quoting *Whitmore*, 495 U.S. at 158).

The best WVCTA can muster is the suggestion that Article 4 creates an "objectively reasonable likelihood," *Clapper*, 568 U.S. at 410, that its members will suffer some sort of harm in the future, which is precisely the standard that the United States Supreme Court rejected as too lenient in *Clapper*. Specifically, WVCTA alleges merely that Article 4 "permits" certain actions that, in its view, "might" result in harm to its members' businesses or disrupt service to its members' customers. Compl. ¶ 30. WVCTA does not, nor could it, allege that those actions are "certainly impending." *Clapper*, 568 U.S. at 410. Indeed, the speculative nature of the harm alleged here is indistinguishable from the situation addressed in *Clapper*, a case in which the United States Supreme Court found no standing when the best a litigant could offer was a "speculative chain of possibilities" that may someday ripen into an injury. *Id.* at 414.

Simply put, WVCTA's complaint suggests that it has "no actual knowledge of" any person or company that imminently plans to take advantage of the provisions of Article 4 by moving

9

existing attachments. *Id.* at 411. And if it had, there is no suggestion that such movement or alteration would result in any concrete or particularized harm to WVCTA's members or the client base of its members. The United States Supreme Court has, in no uncertain terms, held that stacking speculation in this fashion does not satisfy the injury-in-fact requirement for purposes of Article III standing. For this reason, the complaint must be dismissed.

> **B.      Assuming That The WVCTA's Members Suffered An Injury—And They Have Not—The Governor And Attorney General Did Not Cause It, Nor Could They Remedy It.**

Even if WVCTA's members had suffered an injury, neither the Governor nor the Attorney General caused it and entering an injunction against either would fail to remedy it. Another axiomatic principle of federal-court jurisdiction is that a litigant has a right to federal-court relief only if his injury is "fairly traceable to the challenged *conduct of the defendant*." *Spokeo, Inc.*, 136 S. Ct. at 1547 (emphasis added). Because WVCTA failed to connect its members' purported injury to any act already taken or expected to be taken in the future by the Defendants, WVCTA lacks Article III standing.

WVCTA has sued the Governor and the Attorney General in their respective official capacities. Its complaint, however, fails entirely to allege which official acts of these two Constitutional officers it would have this Court enjoin. Regarding the Governor, WVCTA alleges merely that he "is vested with the chief executive power of the State and is responsible for ensuring that the laws of the State are 'faithfully executed.'" Compl. ¶ 10. And regarding the Attorney General, WVCTA alleges merely that he "is the chief legal officer of the State and is responsible for prosecuting and defending all suits in which the State has an interest." *Id.* ¶ 11. Based on these statements, and none others, WVCTA asks the Court to prevent the Defendants from "enforcing" Article 4.

The purported injuries WVCTA seeks to prevent, however, will not (if they occur at all) be caused by any enforcement action by the Defendants of Article 4. Nor will they be rectified or prevented by enjoining the Defendants from enforcing Article 4. Indeed, Article 4 does not, on its face, contemplate *any* enforcement role by *any* West Virginia officer; it merely legalizes private conduct and establishes which entities bear the risk of damages when pole attachments are moved.[1] Moreover, the (still speculative) "significant economic harm and other injuries" WVCTA complains about would be, most proximately, caused by third-parties. Remediation for any (again, wholly speculative) damage would have to come from the third-parties who caused the purported injury.

"Because the case or controversy limitation of Article III requires that [the Court] act only to redress injury that fairly can be traced to the challenged action of" either the Governor or the Attorney General, "and not injury that results from the independent action of some third party not before the court," this Court has no power to redress WVCTA's members' (again, wholly speculative) injury. *See Ege v. U.S. Dep't. of Homeland Sec.*, 784 F.3d 791, 795 (D.C. Cir. 2015) (quotation marks omitted); *see also Fulani v. Brady*, 935 F.2d 1324, 1330 (D.C. Cir. 1991) ("[T]his Court has denied standing where the plaintiff seeks to change the defendant's behavior only as a means to alter the conduct of a third party, not before the court, who is the direct source of the plaintiff's injury." (quotation marks and emphasis omitted)); *see generally Common Cause v. Biden*, 748 F.3d 1280, 1284 (D.C.Cir. 2014) ("To invoke the jurisdiction of the federal courts, . . . a proper defendant [must] be sued."). For that reason, WVCTA lacks Article III standing. And for *that* reason, the case must be dismissed.

---

[1] The Defendants are not conceding that, through the West Virginia Consumer Credit and Protection Act or a similar grant of enforcement jurisdiction, they would have no power to enforce violations of the West Virginia Code that involve the telecommunications industry.

11

## CONCLUSION

This Court should dismiss WVCTA's complaint for lack of jurisdiction.

         Respectfully submitted,

         /s/ *Edward M. Wenger*
         Edward M. Wenger (WV Bar No. 13058)
         General Counsel
         WEST VIRGINIA OFFICE OF THE
         ATTORNEY GENERAL
         State Capitol
         Building 1, Room E-26
         Charleston, WV 25305-0220
         Telephone: (304) 558-2021
         Facsimile: (304) 558-0140
         Email: edward.m.wenger@wvago.gov

DATE: August 25, 2017

**CERTIFICATE OF SERVICE**

      I hereby certify the foregoing has been served electronically using the Court's CM/ECF system on counsel for all parties this 25th day of August, 2017.

                                    /s/ *Edward M. Wenger*
                                    Edward M. Wenger (WV Bar No. 13058)
                                    General Counsel
                                    WEST VIRGINIA OFFICE OF THE
                                    ATTORNEY GENERAL
                                    State Capitol
                                    Building 1, Room E-26
                                    Charleston, WV 25305-0220
                                    Telephone: (304) 558-2021
                                    Facsimile: (304) 558-0140
                                    Email: edward.m.wenger@wvago.gov

DATE: August 25, 2017